No. 22-16490

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ARIZONA ALLIANCE FOR RETIRED AMERICANS et al.,
Plaintiffs-Appellees,

*v.*

KRISTIN K. MAYES, in her official capacity as Arizona Attorney
General,
Defendant-Appellant,

*and*

YUMA COUNTY REPUBLICAN COMMITTEE,
Intervenor-Defendant-Appellant,

*and*

ADRIAN FONTES, in his official capacity as Arizona Secretary of
State, et al.,
Defendants.

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:22-cv-01374-GMS

## PLAINTIFFS-APPELLEES' PETITION FOR REHEARING *EN BANC*

Roy Herrera
Daniel A. Arellano
**HERRERA ARELLANO LLP**
1001 N. Central Ave., Suite 404
Phoenix, Arizona 85004
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com

Dated: October 4, 2024

Aria C. Branch
Christopher D. Dodge
Daniel J. Cohen
Tina Meng Morrison
**ELIAS LAW GROUP LLP**
250 Mass. Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
abranch@elias.law
cdodge@elias.law
dcohen@elias.law
tmengmorrison@elias.law

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

RULE 35(B) STATEMENT AND INTRODUCTION ............................... 1

BACKGROUND ......................................................................................... 3

REASONS FOR GRANTING REHEARING ............................................ 7

    I.    A divided panel erroneously overruled decades of this
    Circuit's precedent based on a misreading of *Hippocratic
    Medicine*. ............................................................................ 7

        A.    The majority misreads *Hippocratic Medicine*. .............. 8

        B.    This Circuit's case law is not clearly irreconcilable
        with Hippocratic Medicine. ......................................... 10

        C.    The majority's heightened organizational standing
        test conflicts with *Hippocratic Medicine* and
        *Havens*. ..................................................................... 13

    II.    This case raises exceptionally important questions about
    standing within this Circuit. ............................................... 16

    III.    The majority makes several other fundamental errors
    that require further review. .................................................. 17

CONCLUSION ........................................................................................ 20

CERTIFICATE OF COMPLIANCE FOR PETITIONS FOR
    REHEARING EN BANC ............................................................... 22

CERTIFICATE OF SERVICE ................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Fed'n of Gov't Emps. Loc. 1 v. Stone,*
    502 F.3d 1027 (9th Cir. 2007) ............................................................ 11

*Arizona v. Yellen,*
    34 F.4th 841 (9th Cir. 2022) .............................................................. 18

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) .............................................................. 18

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ........................................ 1, 2, 5, 8, 9, 12, 13, 16

*Hart v. Massanari,*
    266 F.3d 1155 (9th Cir. 2001) ............................................................ 17

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ....................................................... 1, 9, 15, 20

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ..................................................... 11, 12

*Legal Aid Chi. v. Hunter Props., Inc.,*
    No. 23-CV-4809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) .......... 16

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc) ......................................... 7, 10

*Nielsen v. Thornell,*
    101 F.4th 1164 (9th Cir. 2024) .......................................................... 10

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ............................................................ 11

## Statutes

52 U.S.C. § 20507(a)(3) ............................................................................ 5

52 U.S.C. § 20507(a)(4) ...................................................... 5

52 U.S.C. § 20507(b) .......................................................... 5

52 U.S.C. § 20507(d) .......................................................... 5

A.R.S. § 16-165(A)(10) ...................................................... 4

A.R.S. § 16-165(B) ............................................................. 4

A.R.S. § 16-1016(12) ......................................................... 4

## Other Authorities

Fed. R. App. P. 35(a)(1) ............................................... 7, 15

Fed. R. App. P. 35(a)(2) ................................................... 7

Order, *Republican Nat'l Comm. v. Aguilar*,
No. 24-cv-0518-CDS-MDC (D. Nev. Oct. 2, 2024), ECF No. 119 ....... 16

## RULE 35(B) STATEMENT AND INTRODUCTION

In a divided ruling, a panel of this Court vacated a preliminary injunction based on the majority's conclusion that three plaintiff organizations lack standing to challenge an election law that frustrates and interferes with their core voter registration activities. In doing so, two judges expressly overruled *four decades* of organizational standing precedent in this Circuit, asserting that it conflicts with the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). But no conflict exists, never mind the sort of "clearly irreconcilable" conflict necessary to permit a panel to uproot Circuit law.

The majority reached its consequential decision based on the flawed view that *Hippocratic Medicine* recast the Supreme Court's earlier decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). But as the dissenting judge noted, *Hippocratic Medicine* simply reaffirmed traditional standing principles this Court has long applied. Dissent 47; *see also Hippocratic Med.*, 455 U.S. at 395 (citing *Havens*, 455 U.S. at 379).[1] The majority's bare disagreement with *how* this Court has

---

[1] Citations to "Op." refer to pages 1 through 39 of the panel majority opinion issued on September 20, 2024, while "Dissent" refers to Judge

1

sometimes applied those principles in certain cases is not a valid basis to broadly cast aside this Circuit's organizational standing precedent writ large. Dissent 48.

Moreover, the majority's conclusion that Plaintiffs here lacked standing was wrong. To reach that conclusion, the majority erected a novel heightened standing test for organizations that subjects them to "more scrutiny than that of individual plaintiffs." *Id.* at 50. That new standard conflicts with Supreme Court precedent and ignores the Court's admonition in *Hippocratic Medicine* itself that, to show standing, organizations need only "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." 602 U.S. at 393–94 (citing *Havens*, 455 U.S. at 378–79). Most puzzlingly, it found that Plaintiffs here failed to show standing despite describing how the challenged law "directly affects and interferes with" their core voter registration activities—precisely what both *Hippocratic Medicine* and *Havens* say suffices. The majority's decision improperly "erects new

Nguyen's dissent on pages 46 through 69 (Doc. 84-1). Citations to "ER" refer to the Excerpts of Record filed on November 11, 2022 (Doc. 24).

barriers to the courthouse for organizations that are directly injured by legislation." Dissent 48.

The majority's decision is not just wrong, but hugely consequential, threatening to undermine the fundamental—and settled—framework of standing in federal court litigation in this Circuit. This Court should grant rehearing en banc to correct the panel's errors and immediately vacate the decision. Such relief is necessary to secure and maintain uniformity across the Circuit and minimize the harmful consequences that the decision otherwise portends across countless pending and future cases.

## BACKGROUND

Before the 2022 general election, the Arizona legislature enacted Senate Bill ("SB") 1260, making several changes to the state's election laws that threatened to harm lawful voters and the organizations that work to enfranchise them. As relevant here, SB 1260 required county recorders—without notice to or confirmation from the voter—to cancel a voter's registration upon receiving "confirmation" from another county recorder, or "credible" information from any source, that the voter is

registered in another jurisdiction. *See* A.R.S. §§ 16-165(A)(10), (B) ("Cancellation Provision").[2]

Three organizations—the Arizona Alliance for Retired Americans, Voto Latino, and Priorities USA—sued to enjoin SB 1260 because of the imminent risk it posed to their voter registration and mobilization activities, as well as to the fundamental rights of their members and constituents who vote in Arizona. Supported by unrefuted declaration testimony establishing these harms, Plaintiffs moved for a preliminary injunction of the Cancellation Provision. Despite having sued a broad array of officials—Arizona's Attorney General, Secretary of State, and each of Arizona's fifteen county recorders—not a single defendant, including the intervening party, disputed Plaintiffs' evidence of organizational injury.

The district court granted Plaintiffs' motion in September 2022 and enjoined the Cancellation Provision, finding a substantial likelihood that

---

[2] SB 1260 also made it a class 5 felony to provide a "mechanism for voting" to another person. A.R.S. § 16-1016(12) (the "Felony Provision"). Plaintiffs obtained a preliminary injunction against that provision too. The panel found Plaintiffs had standing to seek such relief but held on the merits that the term "mechanism for voting" was not unconstitutionally vague. Op. 33–39. Plaintiffs do not seek reconsideration of that holding en banc.

it conflicted with the National Voter Registration Act, which imposes strict limitations on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. § 20507(a)(3)–(4), (b), (d). The Arizona Attorney General and intervenor Yuma County Republican Committee appealed. The appeal was fully briefed in early January 2023 and oral argument was held in May 2023.

On June 13, 2024, while the appeal was still pending, the Supreme Court issued its decision in *Hippocratic Medicine*. The panel ordered supplemental briefing on its impact the same day. *See* Doc. 76. As Plaintiffs explained in the briefing they submitted in response to the court's request, *Hippocratic Medicine* reaffirmed long established and well-recognized standing principles, including existing organizational standing precedent premised on *Havens*. *See Hippocratic Med.*, 602 U.S. at 393–94 (citing and discussing *Havens*, 455 U.S. at 378–79); Doc. 80 at 7–9. The Court emphasized *Havens'* strictures but did not change its import: the law remains that an organization satisfies traditional standing criteria when a challenged policy "perceptibly impair[s]" its core activities. *Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379); *see also id.* (explaining how *Havens* illustrates that an

organization is injured when a defendants' actions "directly affect[] and interfere[] with [the organization's] core business activities").

On September 20, 2024, a divided panel concluded that Plaintiffs did not have standing to challenge the Cancellation Provision. Op. 7. In so ruling, two judges purported to overrule decades of this Court's panel and en banc precedent, based on the assertion that it clashed with *Hippocratic Medicine*. *Id.* at 18–23. In the view of the majority, *Hippocratic Medicine* invalidated an entire "line of organizational standing cases" construing *Havens*. *Id.* at 7. Based on its misreading of *Hippocratic Medicine*, the majority crafted new standards for how an organization may show standing within this Circuit. *See id.* at 7–8.

Judge Nyugen "strongly dissent[ed]" from the majority's standing decision and its "deeply flawed analysis." Dissent 46. In her view, *Hippocratic Medicine* broke no new ground on the standing doctrine and did not represent any "sea change" in this Circuit's precedents. *Id.* at 47. She criticized the majority's expansive reading of *Hippocratic Medicine* as a basis to reinterpret *Havens*, observing that—under the majority's construction—even the plaintiff in *Havens* could not establish standing.

*See id.* at 60. Her dissent also highlighted several other analytical errors in the majority's reasoning. *See id.* at 46, 51–63.

## REASONS FOR GRANTING REHEARING

This case satisfies both grounds for en banc consideration: (1) it conflicts with the Supreme Court's decision in *Hippocratic Medicine* and en banc consideration is necessary to secure and maintain uniformity of this Court's decisions, and (2) it involves a question of exceptional importance. Fed. R. App. P. 35(a)(1)–(2).

## I.   A divided panel erroneously overruled decades of this Circuit's precedent based on a misreading of *Hippocratic Medicine.*

Two judges of this Court wrongly concluded that decades of this Circuit's organizational standing precedents were "clearly irreconcilable" with the Supreme Court's decision in *Hippocratic Medicine*, and thus overruled them. Op. 21–23 (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). But *Hippocratic Medicine* "applied traditional standing principles to an organizational plaintiff" and was "hardly a sea change in the law of organizational standing." Dissent 47. It therefore was not a proper basis for a single panel—and a divided one at that—to cast aside four decades of Circuit precedent. *See Miller*, 335 F.3d at 900.

### A. The majority misreads *Hippocratic Medicine.*

The majority's foundational error is its belief that *Hippocratic Medicine* reworked the holding of *Havens* that had rooted this Circuit's precedent. But *Hippocratic Medicine* did no such thing. In that case, medical association plaintiffs that were opposed to abortion challenged regulations promulgated by the Food and Drug Administration that relaxed the requirements for prescribing and obtaining mifepristone, a drug approved 24 years ago for use in early termination of pregnancies. *Hippocratic Med.*, 602 U.S. at 372–75. The associations were not themselves affected by the challenged regulations, and they did not assert any organizational injury other than "incurring costs to oppose FDA's actions," such as conducting their own studies on mifepristone so they could better advocate against the regulations through "citizen petitions to FDA, as well as engaging in public advocacy and public education[.]" *Id.* at 370.

The unanimous Court held the associations "cannot assert standing simply because they object to FDA's actions" and must show "far more than simply a setback to [their] abstract social interests." *Id.* at 394 (quoting *Havens*, 455 U.S. at 379). The Court also made clear that an

organization does not have standing whenever it "diverts its resources in response to a defendant's actions." *Id.* at 395 (stating: "*Havens* does not support such an expansive theory of standing."). Instead, *Havens* applied "the same [standing] inquiry as in the case of an individual" to organizational standing, with the usual standards for injury in fact, causation, and redressability. 455 U.S. at 378–79 & n.19. The Court explained that, in *Havens*, the plaintiff housing counseling organization did not merely show diversion of resources: the defendant's false information about apartment availability "perceptibly impaired" the plaintiff's "core business activities" of providing counseling and referral services. The Court distinguished this harm from the claims of the plaintiffs in *Hippocratic Medicine*, finding that the challenged FDA regulations did not "impose[] any similar impediment to the [plaintiffs'] advocacy business." *Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). The Court accordingly applied traditional standing principles in holding that the associations failed to show injury in fact when they had only "sincere legal, moral, ideological, and policy objections" to the challenged regulations, and their core activities were not directly affected. *Id.* at 396–97.

In other words, *Hippocratic Medicine* did not recast the contours of *Havens*; it reaffirmed them. As the dissent here correctly observed, the majority's real grievance appears to be with this Court's *past application* of the long-established principles in *Havens* in various cases. Dissent 48. But even if (according to the majority) this Court erred in applying *Havens* in some prior cases, that is no basis to set aside an entire "line of organizational standing cases," or to apply a new, heightened standard to Plaintiffs here. Op. 7; *see also* Dissent 48. After all, the 42-year-old *Havens* is clearly not "intervening higher authority," *Miller*, 335 F.3d at 893, and *Hippocratic Medicine* did not change what *Havens* means.

## B. This Circuit's case law is not clearly irreconcilable with Hippocratic Medicine.

While the majority took *Hippocratic Medicine* as license to toss out an entire line of this Court's precedent, it had difficulty explaining why: as Judge Nguyen noted in dissent, the "majority doesn't say" how this Circuit's law is irreconcilable with *Hippocratic Medicine*. Dissent 48. The majority emphasizes that *Hippocratic Medicine* says plaintiffs must do more than "spend money in response" to a law to challenge it, Op. 13, but it acknowledges that this Court "ha[s] often said" the same thing, *id.* 17; *see also, e.g.*, *Nielsen v. Thornell*, 101 F.4th 1164, 1170 n.2 (9th Cir. 2024)

(recognizing "an organization's mere desire to act (and in the process spend resources) to oppose a policy cannot confer standing to challenge that policy"); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citing *Havens*, 455 U.S. at 379) (similar). The majority also stresses that *Hippocratic Medicine* held that an organization may not rely upon setbacks to abstract social goals to show injury. Op. 17. But again, the majority admits that this Court has "often said" the same thing. *Id.* (acknowledging Circuit opinions holding that organizations cannot rely solely on "vindicat[ing] abstract [social] interests" for standing). Finally, the majority repeatedly stresses that an organization must allege its "pre-existing" "core activities are directly affected by the defendant's conduct." Op. 7, 13; *see also id.* 4, 17, 21–24, 28. Again, so too in this Circuit. *E.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organizational standing when "plaintiffs' core activities involve the transportation and/or provision of shelter to unauthorized aliens, and they have diverted their resources" in response to the challenged law); *Am. Fed'n of Gov't Emps. Loc. 1 v. Stone*, 502 F.3d 1027, 1032 (9th Cir. 2007) (holding actions that "perceptibly impair" an organization's "ability to carry out its mission"

show concrete injury). The majority reduces all this precedent to mere "lip service," Op. 17, but nowhere makes clear how it is actually inconsistent with *Hippocratic Medicine*.

The lack of any conflict between *Hippocratic Medicine* and this Circuit's own precedent is further illustrated by the fact that the medical associations in *Hippocratic Medicine* would have failed to show standing under this Court's precedents too. Just as the Supreme Court held those organizations could not "manufacture [their] own standing" by "incurring costs to oppose FDA's actions," *Hippocratic Med.*, 602 U.S. at 394, this Court's precedents yield the same result. *See City of Lake Forest*, 624 F.3d at 1088 (holding organization "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization"). So where precisely is the irreconcilability? The majority simply cannot pinpoint how *Hippocratic Medicine* "breaks … new ground on the standing doctrine." Dissent 46. It does not.

Nor does the majority explain precisely which of this Circuit's cases were wrongly decided under *Hippocratic Medicine*—it expressly overrules a number of cases while otherwise indiscriminately erasing an

entire "line of cases" Op. 7; *see also id. at* 23 (criticizing application of *Havens* in past cases), even though surely some of the more than *sixty* cases in this Circuit applying *Havens* did so correctly under the majority's view. The majority's choice to simply wipe the slate clean leaves future panels with few guideposts on the test for organizational standing.

### C.    The majority's heightened organizational standing test conflicts with *Hippocratic Medicine* and *Havens*.

Having broadly cast aside this Circuit's organizational standing precedent, the majority compounded its error by constructing a new and heightened organizational standing test. Op. 23–29. In that respect, it is the *majority's* opinion that is clearly irreconcilable with *Hippocratic Medicine*. That case recognized that standing exists when challenged conduct "directly affected and interfered with" an organization's "core . . . activities[.]" *Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 379). Plaintiffs clearly met that standard here: they alleged that the challenged laws would undermine and interfere with their core pre-existing voter registration activities. *See, e.g.*, Doc. No. 64 at 4–9; 2-ER-231–32. Yet the majority held Plaintiffs to a higher bar, claiming that under *Hippocratic Medicine*, organizational plaintiffs are subject to greater scrutiny. Op. 22. But "[t]he Supreme Court has repeatedly

explained … that the … standing analysis is the same for organizations as it is for individuals." Dissent 50 (citing *Havens*, 455 U.S. at 378; *Hippocratic Med.*, 602 U.S. at 394). By applying a higher causation standard to Plaintiffs, the majority's reasoning departs from both *Hippocratic Medicine* and *Havens*.

Moreover, the majority's reasoning contradicts *Havens*. As the dissent points out, under the majority's new test, even the plaintiff in *Havens* presumably would not have standing under the majority's new test because the challenged conduct "did not prevent [it] from continuing its core activities of counseling and referring homeseekers to available housing." *Id.* at 61. *Compare id.*, *with* Op. 24 ("[P]laintiffs can still register and educate voters—in other words, continue their core activities that they have always engaged in."). In the majority's view, it doesn't matter if Plaintiffs' core activities are impaired because of a challenged law; as long as they can still do "the exact same things in the exact same ways that they have always done," they lack standing. Dissent 60. But "[w]hen legislation renders an organization's core business activities inadequate or incomplete, and the organization must expend resources modifying the activities to remedy the deficiency, then the legislation

plainly affects and interferes with the activities." *Id.* The Supreme Court made clear that was a basis for standing in *Havens*. *See* 455 U.S. at 379 ("If … petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services …, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.").

At bottom, the majority stretches the logic of *Hippocratic Medicine* well beyond what it can support: in the majority's haste to fundamentally reshape this Court's decades-long organizational standing jurisprudence, the majority created an irreconcilable conflict with the very Supreme Court cases it purports to follow. If left unaddressed, the majority's analysis will sow considerable confusion regarding the test for determining organizational standing in future cases. En banc consideration is necessary to make clear what the law is in this Circuit and ensure the uniformity of the Court's decisions. Fed. R. App. P. 35(a)(1).

**II. This case raises exceptionally important questions about standing within this Circuit.**

The panel's decision is not just exceptionally wrong, but exceptionally consequential. Organizational standing is a "threshold question" that determines who can "get in the federal courthouse door and obtain a judicial determination of what the governing law is." *Hippocratic Med.*, 602 U.S. at 378–79. The majority's novel and improperly heightened organizational standing test threatens to improperly seal the door shut, "erect[ing] new barriers to the courthouse for organizations that are directly injured by legislation." Dissent 48.

Absent en banc review, the majority's opinion risks significantly restricting organizations' ability to vindicate their rights in courts across the Circuit and others. This has already begun to occur. In just the last two weeks, several federal courts have taken notice of the panel's opinion as an authority on standing. *See, e.g.*, *Legal Aid Chi. v. Hunter Props., Inc.*, No. 23-CV-4809, 2024 WL 4346615, at \*8 n.1 (N.D. Ill. Sept. 30, 2024) (noting "the Ninth Circuit recently cast doubt on the standing analysis used in *East Bay Sanctuary Covenant*"); Order, *Republican Nat'l Comm. v. Aguilar*, No. 24-cv-0518-CDS-MDC (D. Nev. Oct. 2, 2024), ECF No. 119.

Because the panel's decision has the potential for far-reaching consequences on such a fundamental tenet in federal litigation, rehearing en banc is merited. *See Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001) ("En banc rehearing would give all active judges an opportunity to hear a case where there is a difference in view among the judges upon a question of fundamental importance, and especially in a case where two of the three judges sitting in a case may have a view contrary to that of the other judges of the court." (cleaned up)).

## III. The majority makes several other fundamental errors that require further review.

Rehearing en banc is also necessary to correct other fundamental errors in the panel's analysis of Plaintiffs' standing.

First, the majority's decision conflates jurisdictional issues with the merits of Plaintiffs' claim. The majority concludes that Plaintiffs' harm was speculative because their alleged injury rested on "either an implausible reading of the Cancellation Provision or pure speculation— neither of which creates … a causal chain to satisfy Article III."[3] Op. 24–

---

[3] The majority also repeatedly conflates the injury and causation elements of standing. While recognizing that standing has three basic prongs of injury, causation, and redressability, the majority concludes that because Plaintiffs' alleged injury is speculative, there is no sufficient

25. But this misunderstands the analytical framework. As the Supreme Court has made clear, Courts must "accept as valid the merits of the plaintiffs' legal claims," and plaintiffs' statutory interpretation need only be "arguable" to serve as a basis for standing. Dissent 51 (cleaned up).

The majority failed to apply that presumption of validity here, even though the judges on the panel disagreed about the meaning of the Cancellation Provision, illustrating that Plaintiffs' interpretation of the statute is at least reasonable. Instead, the majority engaged in a detailed analysis of the statutory text of the Cancellation Provision and used that analysis to come to the conclusion that Plaintiffs lacked standing. That runs headlong into established case law to the contrary. *See Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) ("[T]he Supreme Court has cautioned that standing 'in no way depends on the merits[.]'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665 (9th Cir. 2021) ("[A] plaintiff can have standing despite losing on the merits.").

---

"causal chain" for Article III standing. But no one disputes that Defendants' enforcement of SB 1260 will directly cause Plaintiffs' injury as they have asserted it. The majority's inexplicable merging of the injury and causation analysis only further contributes to the confusion created by its opinion.

Second, by raising and resolving, for the first time on appeal, issues about standing, the majority usurps the district court's role as factfinder, where that court properly credited Plaintiffs' evidence of organizational injury. *See* Dissent 46. Because the district court issued its preliminary injunction on an expedited basis, and none of the parties contested standing below, Plaintiffs did not have any reason, nor the opportunity, to develop and present robust evidence about their injuries arising from SB 1260. *See id.* at 57.

Nevertheless, the sworn declaration testimony that Plaintiffs presented in support of their injunction confirms that the Cancellation Provision *does* impact the organizations' core day-to-day activities of voter registration and mobilization. *See* 2-ER-250 ¶ 12, 2-ER-253 ¶ 29, 2-ER-259 ¶ 19, 2-ER-263 ¶ 4, 2-ER-264 ¶ 6, 2-ER-266 ¶¶ 15, 20.

Finally, the majority's decision muddies the delineation between third-party standing injury and direct organizational injury and, as a result, imposes a level of scrutiny on organizations that exceeds that of individual plaintiffs. As Judge Nguyen explained in dissent, the majority's focus on causation—and requiring that organizations satisfy a heightened causation standard—is misplaced here, where Plaintiffs seek

to establish first-party standing. Dissent 49. And *Hippocratic Medicine*'s passing reference to the need for extra scrutiny on an organization's asserted harm does not apply in this case, because the Supreme Court has been clear that the standards for first-party standing are the same for organizations and individuals. *See Havens*, 455 U.S. at 378.

## CONCLUSION

The petition for rehearing en banc should be granted and the panel majority opinion promptly vacated.

Respectfully submitted this 4th day of October, 2024.

ELIAS LAW GROUP LLP

By: /s/ *Aria C. Branch*
Aria C. Branch
Christopher D. Dodge
Daniel J. Cohen
Tina Meng Morrison
250 Mass. Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
abranch@elias.law
cdodge@elias.law
dcohen@elias.law
tmengmorrison@elias.law

HERRERA ARELLANO LLP

Roy Herrera
Daniel A. Arellano
1001 N. Central Ave., Suite 404
Phoenix, Arizona 85004
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE FOR PETITIONS FOR REHEARING EN BANC

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** _____22-16490_____

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[x] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** _____3,822_____.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** /s/ Aria C. Branch_____ **Date** October 4, 2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 4, 2024.

/s/ *Aria C. Branch*
Aria C. Branch