**Case No. 22-16490**

---

### THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

ARIZONA ALLIANCE FOR RETIRED AMERICANS, et al.,

*Plaintiffs-Appellees,*

*v.*

KRISTIN K. MAYES, in her official capacity as Arizona Attorney General,

*Defendant-Appellant,*

and

YUMA COUNTY REPUBLICAN COMMITTEE,

*Intervenor-Defendant-Appellant,*

and

ADRIAN FONTES, in his official capacity as Arizona Secretary of State, et al.,

*Defendants.*

---

On Appeal from the United States District Court for the District of Arizona
No. 2:22-cv-01374-GMS

---

### ARIZONA ATTORNEY GENERAL'S
### RESPONSE TO PETITION FOR REHEARING EN BANC

---

Joshua D. Bendor (AZ Bar No. 031908)
Joshua M. Whitaker (AZ Bar No. 032724)
OFFICE OF THE ARIZONA
  ATTORNEY GENERAL
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Whitaker@azag.gov
ACL@azag.gov
*Counsel for Arizona Attorney General*

1

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION AND RULE 35(B) COUNTER-STATEMENT .................... 1

BACKGROUND ................................................................................ 3

I.     Cancellation Provision ............................................................ 3

II.    Pre-Implementation Lawsuit and Preliminary Injunction .................... 4

III.   *Hippocratic Medicine* and Panel Decision .................................... 6

REASONS FOR DENYING REHEARING .............................................. 8

I.     The panel's analysis of organizational standing is consistent
with *Havens* as clarified by *Hippocratic Medicine*. .................................... 9

     A.    When evaluating injury, courts should ask whether an
organization's core business activities are interfered
with, not whether its "mission" is frustrated ................................ 9

     B.    When evaluating causation, courts should ask whether
an expenditure is fairly traceable to the challenged
conduct, not whether it is "in response" to the conduct. ........... 12

II.    The panel was correct that *Hippocratic Medicine* overrules the
previous "frustration of mission" and "diversion of
resources" test. ................................................................... 14

III.   Plaintiffs lack standing under ordinary Article III principles. ............ 16

IV.   The panel did not commit the other analytical errors
suggested by Plaintiffs. ......................................................... 20

CONCLUSION ............................................................................... 22

i

CERTIFICATE OF COMPLIANCE ....................................................................24

CERTIFICATE OF SERVICE ...........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ..................................................................... passim

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................. 21

*Clapper v. Amnesty Int'l,*
568 U.S. 398 (2013) .................................................................... 12, 20

*Fair Housing Council of San Fernando Valley v. Roommate.com,*
666 F.3d 1216 (9th Cir. 2012) ........................................................... 16

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023) (en banc) ........................................... 1, 9

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ......................................................................... 1, 10

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2013) (en banc) ............................................. 16

*National Council of La Raza v. Cegavske,*
800 F.3d 1032 (9th Cir. 2015) ........................................................... 16

*Nielsen v. Thornell,*
101 F.4th 1164 (9th Cir. 2024) ........................................................... 16

*Sabra v. Maricopa County Community College District,*
44 F.4th 867 (9th Cir. 2022) .............................................................. 15

*Sierra Club v. Morton,*
405 U.S. 727 (1972) ............................................................................... 9

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ..................................................................................9

## Statutes

A.R.S. § 16-101 ..........................................................................................3
A.R.S. § 16-120 ..........................................................................................3
A.R.S. § 16-165 ....................................................................................3, 17
A.R.S. § 16-1016 ........................................................................................3

## Rules

Fed. R. App. P. 32 ....................................................................................24
Fed. R. App. P. 35 ..................................................................................3, 8

## INTRODUCTION AND RULE 35(B) COUNTER-STATEMENT

The panel correctly concluded that a recent Supreme Court decision—*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)—overruled certain Ninth Circuit case law about organizational standing. The panel also correctly held that the plaintiff organizations here lack standing because they did not show that the Arizona law at issue will injure them. Both conclusions follow from *Hippocratic Medicine* and Article III. Neither warrants rehearing en banc.

In *Hippocratic Medicine*, the Supreme Court clarified its decision about organizational standing in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Previously, Ninth Circuit cases had construed *Havens* broadly, permitting an organization to challenge conduct that (1) "frustrated its mission" and (2) "caused it to divert resources in response to that frustration of purpose." *E.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) (en banc) (cleaned up). But now the Supreme Court has explained that such a broad reading of *Havens* was wrong. Rather, *Havens* merely permitted an organization to challenge conduct that "directly affected and interfered with [its] core business activities," akin to "a retailer who sues a manufacturer for selling defective goods to the retailer."

1

*Hippocratic Medicine*, 602 U.S. at 393–95. The Supreme Court also described *Havens* as "an unusual case" and noted that it "has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396. Thus, the panel here correctly concluded that the previous two-element test for organizational standing—"frustration of mission" and "diversion of resources"—is irreconcilable with *Hippocratic Medicine.* Op. 13–23.

Having correctly interpreted *Hippocratic Medicine*, the panel analyzed whether the plaintiff organizations here could challenge an Arizona law about voter registration, under "the traditional Article III standing requirements" of injury, causation, and redressability. Op. 12. The panel held that the organizations failed to show both injury and causation. Op. 23–29. This holding is correct, because the organizations are (1) suing to enjoin a law that does *not* govern them, (2) based on speculation that government officials might *misapply* the law in a way that defies common sense, (3) claiming an injunction is needed because otherwise the organizations will *voluntarily* spend more resources on voter-assistance activities, and (4) these voter-assistance activities are the kinds of things the organizations *already* do. Traditional standing principles bar this suit, especially after *Hippocratic Medicine*.

2

En banc rehearing is not necessary to secure or maintain uniformity of Ninth Circuit decisions. *See* Fed. R. App. P. 35(b)(1)(A). Nor does this case involve a question of exceptional importance. *See* Fed. R. App. P. 35(b)(1)(B).

## BACKGROUND

### I. Cancellation Provision

An Arizona voter may vote where he or she is "registered to vote as a resident," and may vote only once per election. A.R.S. §§ 16-120(A), -1016(2), (3), (4). A voter "has only one residence" for voting purposes. A.R.S. § 16-101(B).

To address the risk of a person voting twice in different counties, Arizona enacted a law in 2022, requiring a county recorder to cancel a voter's registration in that county if the recorder (1) receives confirmation from another county that the voter "has registered" in that other county, or (2) receives credible information that the voter "has registered" in another county and confirms with that other county. A.R.S. § 16-165(A)(11), (B). So, for example, if a voter is registered in Maricopa County but then moves to Pima County and registers there, the Maricopa County Recorder would

confirm with Pima County and then cancel the old registration in Maricopa County. The parties refer to this law as the Cancellation Provision.[1]

## II. Pre-Implementation Lawsuit and Preliminary Injunction

Plaintiffs are nonprofit organizations that seek to ensure various groups are registered to vote. 2-ER-274–78 ¶¶ 21 ("retirees"), 25 ("young and Latinx voters"), 27 ("voters across the country"). They sued to enjoin the Cancellation Provision before it became effective. 2-ER-269 ¶ 1. They did not identify any voter whose registration had been, or would be, cancelled under the law. *See* 2-ER-268–302. Nor did they specify how any county recorder plans to implement the law. *Id.*

Instead the organizations speculated that county recorders *might* implement the law in a bizarre way: by cancelling registration of voters in counties where they *still reside and plan to vote*, without notifying them. 2-ER-285–86 ¶¶ 62–67. According to the organizations, "nothing in the Cancellation Provision prevents" this disenfranchisement scenario. *Id.* ¶ 64.

---

[1] The panel also analyzed another law: the Felony Provision. Op. 29–39. Plaintiffs' petition for rehearing en banc does not challenge the panel's conclusions or otherwise seek rehearing as to that law. Pet. 4 n.2.

The organizations further asserted that, based on this (imagined) disenfranchisement scenario, the Cancellation Provision "frustrate[s] their mission" and would cause them to "divert resources" to things like "educating" voters and "identifying" voters registered in more than one county so they can "cancel their non-active registrations." 2-ER-275–78 ¶¶ 22, 26, 28; *see also* 2-ER-252–53 ¶¶ 24–29, 2-ER-258–59 ¶¶ 15–21, 2-ER-265–66 ¶¶ 14–20 (declarations submitted with preliminary injunction motion).

The Attorney General observed, however, that longstanding election procedures in Arizona already required county recorders to cancel duplicate registrations between counties in a way that ensures eligible voters are not disenfranchised. 2-ER-197–202, 208–11. Similarly, the Secretary of State interpreted the Cancellation Provision consistent with existing election procedures that do not cause improper disenfranchisement. 2-ER-181–85. Likewise, the legislator who sponsored the Cancellation Provision confirmed that the law was never intended to impact a voter's "current voter registration." 2-ER-126–29 ¶¶ 4, 17–18.

The district court nevertheless concluded that the organizations had standing based on "the risk that [they] will need to divert resources" to help voters registered in multiple counties cancel their old registration, because

otherwise such voters "would risk" disenfranchisement if a county recorder cancels their *current* registration. 1-ER-015 at n.7; 1-ER-021. The district court then enjoined the law. 1-ER-023.

## III.  *Hippocratic Medicine* **and Panel Decision**

During this appeal, the Supreme Court decided *Hippocratic Medicine*. The plaintiff organizations in that case were pro-life medical associations, challenging FDA actions. 602 U.S. at 372. To support their standing, the organizations cited *Havens* and offered arguments that mirror the ones made here. Specifically, they argued that the FDA actions "impaired" their ability to "achieve their organizational missions" and "forced" them to spend resources on activities such as "public education." *Id.* at 393–95. The Supreme Court rejected this standing theory, clarifying that *Havens* was an "unusual case" that the Supreme Court "has been careful not to extend," involving an organization suing about conduct that "directly affected and interfered with [its] core business activities." *Id.* at 395–96.

In light of *Hippocratic Medicine*, the panel in this case explained that organizations, like individuals, must meet "the traditional Article III standing requirements" of injury, causation, and redressability. Op. 12. The injury must be "concrete" and "particularized," as well as "real or

6

imminent." Op. 14. And the causal link between the challenged conduct and the asserted injury must be "sufficiently close and predictable." Op. 14–15.

The panel observed that some Ninth Circuit cases construing *Havens* had "lost sight of these requirements" by allowing "organizations to sue when they have alleged little more than that they have diverted resources in response to the defendant's actions to avoid frustrating the organization's loosely defined mission." Op. 12. The panel also described how this broad interpretation of *Havens* evolved, prompting "[m]any judges on this circuit" to object. Op. 16–21. And the panel explained that this broad interpretation is "clearly irreconcilable" with *Hippocratic Medicine*. Op. 21–23.

Turning to the organizations here, the panel held that they lack standing for two reasons. First, they have not shown injury, because the Cancellation Provision does not interfere with their "core activities." Op. 24. Indeed, the Cancellation Provision does not govern them at all. Even if they spend resources helping voters who are registered in multiple counties, that is just "spending money voluntarily in response to a governmental policy," for "activities that they have always engaged in." *Id.*

7

Second, even if the organizations' expenditures on voter assistance were an injury, the causal link between the Cancellation Provision and this injury is "too attenuated." Op. 24. The organizations theorize that the Cancellation Provision "may cause a county recorder to cancel the voter's new registration instead of the old one," but this theory "rests on either an implausible reading of the Cancellation Provision or pure speculation." Op. 24–25. Indeed, this theory is "belied by the statutory language, common sense, and statements from bipartisan state elected officials in charge of administering and enforcing Arizona's election laws." Op. 27 n.5.

Thus, the panel held that the organizations "lack standing to challenge the Cancellation Provision." Op. 39.

## REASONS FOR DENYING REHEARING

En banc rehearing is not "necessary to secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1). The panel's analysis of organizational standing is consistent with *Havens* as clarified by *Hippocratic Medicine*. Arg. § I below. And the panel's observation that *Hippocratic Medicine* requires overruling the previous two-element test for organizational standing ("frustration of mission" and "diversion of resources") is correct and undisputed by any other panel. Arg. § II below.

8

Nor does this case raise "a question of exceptional importance." Fed. R. App. P. 35(a)(2). Plaintiffs lack standing under ordinary Article III principles. Arg. § III below. And the panel did not commit the analytical errors suggested at the end of Plaintiffs' petition. Arg. § IV below.

## I. The panel's analysis of organizational standing is consistent with *Havens* as clarified by *Hippocratic Medicine.*

Previous Ninth Circuit cases derived a two-element test from *Havens*, permitting an organization to challenge conduct that (1) "frustrated its mission" and (2) "caused it to divert resources in response to that frustration of purpose." *E.g.*, *Fellowship of Christian Athletes*, 82 F.4th at 682 (cleaned up). The panel here correctly concluded that this two-element test cannot be squared with *Hippocratic Medicine*, which requires an organization asserting this kind of injury to show that its "core activities are directly affected by the defendant's conduct." Op. 13 (citing *Hippocratic Medicine*).

### A. When evaluating injury, courts should ask whether an organization's core business activities are interfered with, not whether its "mission" is frustrated.

To establish standing, a plaintiff's injury must be concrete, not abstract. A plaintiff's moral, social, or policy objection to a defendant's action does not confer standing. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–87 (1982) (discussing

9

standing for individuals); *Sierra Club v. Morton*, 405 U.S. 727, 734–41 (1972) (discussing standing for organizations).

This principle can be evaded if injury turns on whether an organization's *mission* is frustrated. Tellingly, in *Havens*, the Supreme Court never analyzed whether the organizational plaintiff's "mission" was frustrated. Rather, the organization suffered a "concrete and demonstrable injury to [its] *activities*." 455 U.S. at 379 (emphasis added). The organization was in the business of providing housing counseling to home seekers, but the defendant (an apartment owner) gave false information about apartment availability to black people, including one of the organization's own employees. *Id.* at 366–69, 378–79. Those actions "directly affected and interfered with [the organization's] *core business activities*," akin to a manufacturer who sells defective goods to a retailer. *Hippocratic Medicine*, 602 U.S. at 395 (emphasis added).

Notably, the plaintiffs in *Hippocratic Medicine* made a frustration-of-mission argument, claiming that the FDA "impaired" their "ability to provide services *and achieve their organizational missions*." 602 U.S. at 394 (citation omitted) (emphasis added). But the Supreme Court rejected this view, stating: "That argument does not work to demonstrate standing." *Id.*

10

Accordingly, the panel here correctly recognized that, in light of *Hippocratic Medicine*, organizations invoking a *Havens* standing theory must show that the conduct they are challenging interferes with their "core business activities," not just their "mission." Op. 17–18, 21–22.[2]

Contrary to Plaintiffs' suggestion, this is not a "heightened" standard for organizations compared with individuals. *E.g.*, Pet. 13. Rather, this standard restores the traditional injury requirement for organizations. *E.g.*, Op. 22 ("So just as a consumer must suffer an actual and concrete harm, the organization must suffer an actual and concrete harm."). It is the previous (now-overruled) mission-focused test that improperly loosened the injury requirement for organizations. Just as an individual's standing should not depend on whether his or her personal "mission" is frustrated, neither should an organization's standing.

---

[2] Of course, organizations could assert other non-*Havens* standing theories. For example, regarding the Felony Provision, the panel acknowledged that *Hippocratic Medicine* does not undermine an organization's standing to challenge a statute that directly regulates it. Op. 30 n.6.

**B.** **When evaluating causation, courts should ask whether an expenditure is fairly traceable to the challenged conduct, not whether it is "in response" to the conduct.**

Another basic standing principle is that a plaintiff's injury must be fairly traceable to the conduct being challenged. The injury may not be voluntarily self-inflicted, nor based on speculation. *See, e.g.*, *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013) (plaintiffs who "incurred certain costs as a reasonable reaction to a risk of harm," where the risk was "not certainly impending," lacked standing); *id.* at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

This principle can be evaded if causation turns on whether an organization spends resources *in response* to challenged conduct. This is because organizations may spend resources "in response" to conduct for purely voluntary reasons, or based on a clear misinterpretation of the law, or to mitigate a purely speculative risk. In such situations, the organization's expenditures are not fairly traceable to the challenged conduct.

*Hippocratic Medicine* confirmed that causation requires directness. Specifically, when a plaintiff challenges a government policy that "require[s] or forbid[s] some action by the plaintiff," causation is "usually easy to

12

establish." 602 U.S. at 382. But, when a plaintiff challenges a government policy that regulates "*someone else*," causation is "ordinarily substantially more difficult to establish." *Id.* (cleaned up). In such cases, the plaintiff "must show a predictable chain of events" leading from the policy to the asserted injury. *Id.* at 385. Causation is not satisfied when the effects of the policy are "not sufficiently predictable," nor when the effects are too "distant (even if predictable)." *Id.* at 383.

Notably, the plaintiffs in *Hippocratic Medicine* made a resource-expenditure argument, claiming that FDA actions "caused" them to "conduct their own studies" to "better inform their members and the public" about certain "risks," as well as to "expend considerable time, energy, and resources" on "engaging in public advocacy and public education." 602 U.S. at 394. They specifically argued that, under *Havens*, "standing exists when an organization diverts its resources *in response* to a defendant's actions." *Id.* (emphasis added). The Supreme Court rejected this reading of *Havens* as "incorrect." *Id.* Rather, in *Havens*, the defendant's actions "*directly* affected and interfered with" the organization's core business activities. *Id.* at 395 (emphasis added).

Accordingly, the panel here correctly recognized that, in light of *Hippocratic Medicine*, organizations do not have standing to challenge a government policy based on "mere diversion of resources in response to [the] policy."  Op. 18–19, 22–23.[3]

Again, contrary to Plaintiffs' suggestion, this is not a "heightened" standard for organizations compared with individuals.  *E.g.*, Pet. 13.  Rather, this standard restores the traditional causation requirement for organizations.  Neither individuals nor organizations can sue about a government policy they disagree with, just because they spend resources "in response" to it.

## II. The panel was correct that *Hippocratic Medicine* overrules the previous "frustration of mission" and "diversion of resources" test.

The panel correctly explained that the two-element "frustration of mission" and "diversion of resources" test contained in some previous Ninth Circuit cases is "clearly irreconcilable" with *Hippocratic Medicine*.  Op. 16–23.

---

[3] The panel also stated that an organization that challenges a policy using a *Havens* standing theory "must show that the new policy directly harms its *already-existing* core activities."  Op. 23.  This temporal qualifier is dictum.  Whether an organization could challenge a policy that prohibits core activities in which it was *imminently planning to engage*, for example, remains an open question for another case.

14

An example proves the point. In *Sabra v. Maricopa County Community College District*, a "non-profit organization that advocates for the civil rights of American Muslims" sued a college district and a teacher, claiming that the teacher's in-class portrayal of Islam "frustrated its mission and caused it to divert resources in order to combat [the teacher's] distorted portrayal." 44 F.4th 867, 873 (9th Cir. 2022). Specifically, the organization "contracted with a religious scholar to develop materials for a public-awareness campaign that would correct Islamophobic information," thus "diverting resources" from its "usual advocacy activities." *Id.* at 877 (cleaned up). The *Sabra* panel felt obliged, "under our court's precedents," to hold that "such an injury is sufficient to confer Article III standing on an organizational plaintiff." *Id.* at 879–80.

*Sabra* would have come out differently after *Hippocratic Medicine*, because the teacher's in-class portrayal of Islam did not *directly* interfere with the organization's *core activities*. As the panel in the present case explained, *Sabra* was an example of judges "relying solely on the two-part frustration of mission and diversion of resources framework." Op. 20.

Plaintiffs critique the panel for not specifying "precisely which" Ninth Circuit cases are overruled. Pet. 12–13. But the panel specified that *Sabra*

15

and three similar cases are "overruled." Op. 23.[4] In any event, that alleged lack of precision does not justify en banc rehearing, because the bottom line is clear: the "frustration of mission" and "diversion of resources" test is no longer good law.

The panel had no choice but to reach that holding, which was dictated by *Hippocratic Medicine* and does not conflict with any other panel decision interpreting *Hippocratic Medicine*. And the mere fact that a Supreme Court decision requires a change in course does not justify en banc review. Indeed, even district courts must change course "where intervening Supreme Court authority is clearly irreconcilable with [] prior circuit authority." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2013) (en banc).

## III. Plaintiffs lack standing under ordinary Article III principles.

The panel's ultimate holding—that Plaintiffs lack standing to challenge the Cancellation Provision—follows from ordinary Article III principles in light of *Hippocratic Medicine*.

---

[4] The three similar cases are *Nielsen v. Thornell*, 101 F.4th 1164 (9th Cir. 2024); *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015); and *Fair Housing Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216 (9th Cir. 2012).

Notably, the Cancellation Provision does not govern Plaintiffs at all. It governs county recorders, who may cancel old registrations of voters who register in another county. A.R.S. § 16-165(A)(11), (B). Plaintiffs did not identify any voter whose registration would be cancelled, nor specify how any county recorder plans to implement the law.

Instead Plaintiffs speculated that county recorders *might* cancel registrations of voters in counties where they still reside, without notifying them. 2-ER-285–86 ¶¶ 62–67. And they claimed that such disenfranchisement would "frustrate [their] mission" (which includes registering voters) and cause them to "divert resources" to "educating" voters and "identifying" voters registered in multiple counties who can then "cancel their non-active registrations" to avoid the (imagined) risk of disenfranchisement. 2-ER-274–78 ¶¶ 21–22, 25–28; *see also* 2-ER-252–53 ¶¶ 24–29, 2-ER-258–59 ¶¶ 15–21, 2-ER-265–266 ¶¶ 14–20.

Plaintiffs maintained this speculative theory despite explanations from the Attorney General, Secretary of State, and sponsoring legislator, that the law could be implemented consistent with existing election procedures that do *not* cancel voters' current registrations. *See* 2-ER-197–202, 208–11; 2-ER-181–85; 2-ER-129 ¶¶ 17–18.

The panel correctly held that Plaintiffs lack standing here. First, Plaintiffs failed to show injury. They can still continue their core voter registration "activities that they have always engaged in." Op. 24. And their plans to educate voters and assist them during registration are simply "spending money voluntarily in response to a governmental policy." *Id.*

This conclusion is compelled by *Hippocratic Medicine*, where the Supreme Court deemed standing absent even though organizations claimed that government actions "forced" them to spend resources on "inform[ing] their members and the public" about "risks" as well as "public education." 602 U.S. at 394. That sort of standing theory may have worked before, in cases like *Sabra*, but it no longer works after *Hippocratic Medicine*.

Second, Plaintiffs failed to show causation. Their theory that county recorders might cancel voters' current registrations instead of their old ones "rests on either an implausible reading of the Cancellation Provision or pure speculation." Op. 24–25. The speculative nature of this theory is confirmed by the explanations of existing election procedures by the Attorney General, Secretary of State, and sponsoring legislator. Op. 25–27 & n.5.

Even Plaintiffs do not allege that county recorders *will* misapply the Cancellation Provision in a way that cancels voters' current registrations.

18

They merely allege that county recorders "could" do so, because "nothing in the Cancellation Provision prevents" it. 2-ER-285–86 ¶ 64. This artful pleading confirms the speculative nature of the allegations.

This conclusion is likewise compelled by *Hippocratic Medicine*, where the Supreme Court clarified that the causal link between a government policy and a plaintiff's asserted injury is "ordinarily substantially more difficult to establish" when the policy does not govern the plaintiff. 602 U.S. at 382 (cleaned up). Specifically, causation is not satisfied when the effects of the government policy are "not sufficiently predictable" or are too "distant (even if predictable)." *Id.* at 383. Here, Plaintiffs' speculation that a county recorder might misapply the Cancellation Provision is both unpredictable and distant.

In short, the standing question here is easy after *Hippocratic Medicine*. Plaintiffs' assertion that this case raises "exceptionally important questions about standing" is off-base. Pet. 16–17.

**IV. The panel did not commit the other analytical errors suggested by Plaintiffs.**

Plaintiffs also argue that the panel committed three other analytical errors. Pet 17–20. No such error occurred. And none raises a question of exceptional importance.

*First*, Plaintiffs argue that the panel "conflate[d]" standing with "the merits" by not *assuming* that county recorders will misapply the Cancellation Provision in a way that cancels voters' current registrations. Pet. 17–18. But courts often evaluate whether the causal link in a standing theory is too speculative or attenuated. *E.g.*, *Hippocratic Medicine*, 602 U.S. at 390–93 ("causal link" between government action and claimed injury was "too speculative or otherwise too attenuated to establish standing"); *Clapper*, 568 U.S. at 410–14 (rejecting standing theory that relied on "speculative chain of possibilities").

That is what the panel did here. The panel explained that "in determining whether a chain-of-causation is too speculative," courts must examine "whether a plaintiff is relying on a far-fetched speculation in assessing how a statute may be applied." Op. 27 n.5. And the panel clarified

20

that it was not "addressing the merits" of Plaintiffs' "preemption argument." *Id.*

This approach was proper. Indeed, a contrary approach—requiring the panel to *accept* Plaintiffs' speculation that the Cancellation Provision might be misapplied—would violate basic principles of adjudication. For example, when deciding whether to dismiss a complaint, judges need not accept "legal conclusions" or "conclusory statements" and may invoke "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Yet Plaintiffs' theory about how the Cancellation Provision might be misapplied is a legal conclusion, a conclusory statement, and contrary to common sense, all at once.

*Second*, Plaintiffs argue that the panel "usurp[ed]" the district court's factfinding role by resolving standing issues on appeal. Pet. 19. But whether Plaintiffs' declarations sufficed for standing to warrant a preliminary injunction is a legal question subject to de novo review, as the panel explained. Op. 11–12.

Moreover, Plaintiffs identify no fact found by the district court that the panel ignored. Indeed, the district court did not find facts at all. Rather, it concluded that Plaintiffs had standing based on "the risk that [they] will

need to divert resources" to help voters registered in multiple counties cancel their old registration. 1-ER-015 at n.7; 1-ER-022. This standing theory fails as a matter of law after *Hippocratic Medicine*.

*Third*, Plaintiffs argue that the panel "muddie[d]" the difference between third-party standing and first-party standing, resulting in a "heightened" causation requirement for Plaintiffs' first-party standing theory. Pet. 19–20. But the panel did no such thing. Rather, the panel acknowledged that Plaintiffs were "asserting their own injuries" and that this was a "first-party standing" theory. Op. 15 n.2.

Moreover, the panel recognized that "first-party standing analysis is the same for organizations as it is for individuals." *Id.* The problem, as the panel explained, is that previous Ninth Circuit cases had interpreted *Havens* broadly and therefore did not apply traditional standing requirements as "rigorously" to organizations. *Id.* After *Hippocratic Medicine*, the standing analysis should be equally rigorous for organizations and individuals, as the panel correctly held.

## CONCLUSION

The petition for rehearing en banc should be denied.

Respectfully submitted this 28th day of October, 2024.

KRISTIN K. MAYES
ARIZONA ATTORNEY GENERAL

By */s/ Joshua M. Whitaker*
Joshua D. Bendor (AZ Bar No. 031908)
Joshua M. Whitaker (AZ Bar No. 032724)
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Whitaker@azag.gov
ACL@azag.gov

*Counsel for Arizona Attorney General*
*Kristin K. Mayes*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 22-16490 |

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,185 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Joshua M. Whitaker | **Date** | 10/28/2024 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/2021*

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the CM/ECF system which will send electronic notification of such filing to all counsel of record.

Dated this 28th day of October, 2024.

*/s/ Joshua M. Whitaker*