No. 22-16490

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

ARIZONA ALLIANCE FOR RETIRED AMERICANS, *et al.*,
Plaintiffs-Appellees,

v.

KRISTIN K. MAYES, in her official capacity as
Attorney General for the State of Arizona,
Defendant-Appellant,

and

YUMA COUNTY REPUBLICAN COMMITTEE,
Intervenor-Defendant-Appellant,

and

ADRIAN FONTES, in his official capacity as
Secretary of State for the State of Arizona, *et al.*,
Defendants.

————————————

On Appeal from the United States District Court
for the District of Arizona
No. 2:22-cv-1374

————————————

# BRIEF FOR UNITED STATES OF AMERICA
# AS AMICUS CURIAE IN SUPPORT OF APPELLANTS

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

TIMOTHY COURCHAINE
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## TABLE OF CONTENTS

**<u>Page</u>**

INTEREST OF THE UNITED STATES ........................................................................1

INTRODUCTION AND SUMMARY .........................................................................1

STATEMENT OF THE CASE .....................................................................................3

ARGUMENT ............................................................................................................ 12

     A.    The Supreme Court's Decision in *Alliance for Hippocratic Medicine* Makes Clear that Plaintiffs Have Not Identified an Injury Sufficient to Confer Standing ........................................................12

     B.    The Supreme Court's Earlier Decision in *Havens Realty* Provides No Basis for Accepting Plaintiffs' Theory of Injury ................................17

     C.    The Diversion-of-Resources Theory of Standing Advanced by Plaintiffs Is Incompatible with Ordinary Standing Principles ................20

CONCLUSION ......................................................................................................... 27

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                **Page(s)**

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ............................................................................26

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................25

*Diamond v. Charles,*
   476 U.S. 54 (1986) ........................................................................22, 23

*East Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018) ........................................................ 1, 22

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC,*
   666 F.3d 1216 (9th Cir. 2012) ..................................................... 23, 24

*FDA v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) ......................... 2, 8, 9, 12, 13, 14, 16, 17, 18, 19, 20, 21

*Gill v. Whitford,*
   585 U.S. 48 (2018) ..............................................................................26

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) ............................................................................26

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ....................................................................... 8, 17

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013) ............................................................................21

*Johnson v. Weinberger,*
   851 F.2d 233 (9th Cir. 1988) ..............................................................23

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ............................................................................22

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................ 18, 25

*Smith v. Pacific Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) .................................................................. 23

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................... 1

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 1

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .................................................................................... 26

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021) ...................................................................................... 1

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .................................................................................... 24

**Statutes:**

52 U.S.C. § 20507 .............................................................................................. 7

Ariz. Rev. Stat. Ann. § 16-165(A)(11) ............................................................ 3

Ariz. Rev. Stat. Ann. § 16-165(B) .................................................................... 3

**INTEREST OF THE UNITED STATES**

The United States has a substantial interest in the proper resolution of the organizational standing questions presented by plaintiffs' en banc petition in this case. The United States is frequently a defendant in suits brought by organizational plaintiffs that rely on diversion-of-resource theories similar to the theory invoked by plaintiffs in this case to establish standing. For example, the panel dissent suggested that the theory of standing advanced by plaintiffs here is materially identical to a theory that this Court previously accepted in permitting entities that provided legal services to challenge immigration regulations issued by the federal government. *See* Op. 61-62 (Nguyen, J., dissenting in part) (citing *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)).

Moreover, and more generally, the United States has a substantial interest in the proper application of Article III's requirements for standing to sue in federal court and has repeatedly filed amicus briefs in such cases. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

**INTRODUCTION AND SUMMARY**

Plaintiffs are organizations with an interest in voter education and mobilization who challenge an Arizona statute regulating the circumstances under which county recorders should cancel a voter's duplicate registration. That statute does not require plaintiffs to conduct—or to refrain from conducting—their activities in any particular

way. Instead, the statute regulates county recorders as well as voters who are registered in multiple counties. Plaintiffs nonetheless claim to be harmed by the statute because they will assertedly expend resources modifying their activities in response to its enactment—they will, for example, develop programs to educate voters about the possibility of cancellation and ask potential new registrants about whether they have previous voter registrations.

As the panel correctly concluded, that theory of Article III standing cannot be reconciled with the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In that case, the Court made clear that organizations do not establish standing to sue simply by asserting that an agency action "impaired their ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). Squarely considering the argument raised here—that "standing exists when an organization diverts its resources in response to a defendant's actions"—the Court stated: "That is incorrect." *Id.* at 395. Plaintiffs' claim to organizational standing in this case thus fails.

More fundamentally, the diversion-of-resources theory of standing espoused by plaintiffs in this case—and accepted by this Court in other cases pre-dating *Alliance for Hippocratic Medicine*—should be rejected. Such theories of standing lead to results that are fundamentally incompatible with the normal operation of Article III principles. For example, organizations have relied on diversion-of-resources theories to challenge actions that affected third parties—rather than the organizations themselves—without

2

satisfying the stringent limitations that ordinarily accompany any attempt to assert third parties' rights. Moreover, diversion-of-resources standing is in significant tension with the usual rule that injury to a litigant's policy preferences is not sufficiently concrete to satisfy Article III. It allows organizational plaintiffs to spend their way to standing by voluntarily diverting resources in response to actions that do not themselves give rise to standing. And it enables organizational plaintiffs to receive universal relief that goes far beyond the relief that actual regulated entities could properly receive. In short, diversion-of-resources standing has developed into a means for organizations to end-run many of the usual limitations on standing, bringing suits that similarly situated individual litigants could never bring and nullifying Article III's constraints.

## STATEMENT OF THE CASE

1. In June 2022, the State of Arizona enacted Senate Bill 1260 "to tackle (what the state perceived as) the problem of unlawful voting." Op. 8. That legislation contains a provision, termed the Cancellation Provision, that directs a county recorder to cancel a voter's registration if the recorder either (1) "receives confirmation from another county recorder that the person registered has registered to vote in that other county," Ariz. Rev. Stat. Ann. § 16-165(A)(11); or (2) receives "credible information that a person has registered to vote in a different county" and then "confirm[s] the person's voter registration with that other county," *id.* § 16-165(B).

3

In other words, the provision was enacted to ensure that voters are registered in only one county. In particular, the statute tackles the problem that could arise if a voter who was registered to vote in one county moved to a new county without cancelling her previous registration.

2. Plaintiffs—Arizona Alliance for Retired Americans, Inc.; Voto Latino; and Priorities USA—filed this suit challenging the Cancellation Provision (along with other provisions included within Senate Bill 1260). *See* 2-ER-274-77. Plaintiffs are nonprofit organizations, and each claims a general interest in voter registration activities.

In particular, Arizona Alliance asserts that its "mission is to ensure social and economic justice and full civil rights" for retirees and that it "accomplishes this mission by actively pursuing and promoting legislation and public policies" and by "ensuring that its members are able to register to vote and meaningfully participate in Arizona's elections." 2-ER-274. To that end, Arizona Alliance conducts "voter registration activities such as encouraging voter registration at member meetings and phone banking drives." *Id.*

For its part, Voto Latino states that it "is dedicated to growing political engagement in historically underrepresented communities, specifically young and Latinx voters." 2-ER-276. Thus, Voto Latino expends funds "to educate, mobilize, and turn out voters in Arizona," such as by "engag[ing] in voter registration drives and conduct[ing] email and social media advertising campaigns to remind voters" to

4

"vote and to keep their voter registrations up to date." *Id.* Voto Latino also engages in "get-out-the-vote efforts, including text banking and advertising campaigns, to encourage voters to vote, remind them to update their voter registrations, and inform them about available means of voting." *Id.*

Similarly, Priorities USA "works to help educate, mobilize, register, and turn out voters across the country." 2-ER-277. It engages in those activities in furtherance of its "mission" to "build a permanent infrastructure to engage Americans by persuading, registering, and mobilizing citizens around issues and elections that affect their lives." *Id.*

Plaintiffs allege that the Cancellation Provision may lead county recorders to improperly cancel voter registrations that are tied to voters' current addresses, if those voters also have previous voter registrations that they failed to cancel when they moved. *See* 2-ER-285-86. Arizona Alliance's president asserted in a declaration, for example, that the provision would cause the organization to "ensure that" prospective voters "are only registered to vote in one location, so that they are not removed from the voter registration roll" in "the county in which they intend to vote." 2-ER-252; *see also* 2-ER-231.

More generally, plaintiffs have averred in declarations that, in response to the Cancellation Provision, they will expend additional resources on voter-related training, registration, and other activities. Arizona Alliance avows that it will spend "additional time and resources" on its registration and education efforts in response to the

Cancellation Provision. 2-ER-250. For example, Arizona Alliance "would consider creating a training program on how to cancel an out-of-state or out-of-county voter registration"; would ask additional questions of potential voters when conducting "phone banking" and "member events," such as whether the voters "have any previous addresses, and whether they might still be registered to vote there"; and would expend additional resources "toward identifying voters who have multiple registrations" and "helping voters cancel their other voter registrations." *Id.*; *see also* 2-ER-252-53 (Arizona Alliance "will need to create specialized trainings, use professional and volunteer time, and spend money in order to educate its members about the effects of," and to "help answer questions from its members" about, the Cancellation Provision).

Voto Latino similarly avows that it will respond to the Cancellation Provision by expending resources on education and registration efforts. Thus, Voto Latino states that it will "launch an educational campaign informing its constituents about these provisions and emphasizing the need for them to check whether they have multiple voter registrations." 2-ER-259. Voto Latino also states that it will expend resources "to check whether its constituents have voter registrations in multiple states or Arizona counties" and to "help them to cancel their non-active registrations." *Id.* And it further states that, although the "risk" of "attempted voter purges" is "not new," Voto Latino will "divert additional time and resources to monitor for attempted voter purges in Arizona" as a result of the Cancellation Provision. *Id.*

6

Priorities USA's allegations are similar. It avows that the Cancellation Provision will lead it to "provide more grant funds to in-state partner organizations so that they can provide education and training" and will lead it to "spend time and funds on making voters aware that they need to determine whether they have multiple voter registrations and that they should cancel any prior registrations." 2-ER-266. And Priorities USA additionally states that, as a result of the Cancellation Provision, it will "utilize more staff time to analyze data and reports on voting activities to obtain the same understanding of the voting landscape and where to focus its efforts." *Id.*

3. The district court granted plaintiffs' motion for a preliminary injunction prohibiting enforcement of the Cancellation Provision. Applying then-applicable precedent, the district court concluded that plaintiffs had established standing because plaintiffs had shown a "risk" that they "will need to divert resources to assist in canceling former voter registrations because failing to do so would risk the voter's registration being cancelled without notice." 1-ER-15 n.7 (alteration and quotation omitted); *see also* 1-ER-21 (concluding that plaintiffs had established irreparable harm necessary to support a preliminary injunction because they "assert that they must divert resources to combat the negative effects of the" Cancellation Provision). On the merits, the court concluded that the Cancellation Provision conflicts with, and is thus preempted by, a federal statute that "impose[s] requirements on the removal of a voter from the voting rolls." 1-ER-8-9; *see* 52 U.S.C. § 20507.

4. On appeal, a divided panel of this Court vacated the relevant portion of the district court's preliminary injunction on the ground that plaintiffs lacked standing to challenge the Cancellation Provision. In reaching that conclusion, the panel held that the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), had abrogated the line of this Court's cases regarding organizational standing upon which the district court had relied.

At the outset, the panel reiterated the basic requirements of Article III standing: to meet Article III's requirements, plaintiffs must demonstrate that they have suffered a "concrete" and "real or imminent" injury that is closely and predictably linked to the defendant's challenged action and that will be cured by a favorable ruling. Op. 13-16 (quotation omitted). Notwithstanding those usual requirements, the panel explained, this Court had "derived a two-part test" from the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), that "confer[s] standing on organizations" if they allege "that a challenged policy (1) frustrated the organization's mission or goal, and (2) required the organization to spend money or divert resources in response." Op. 16.

But, the panel continued, the Supreme Court's more recent decision in *Alliance for Hippocratic Medicine* makes clear that this Court's organizational standing precedents are incorrect. First, *Alliance for Hippocratic Medicine* clarified that *Havens Realty* does not support recognizing standing based on an organization's allegations that the challenged policy frustrates its "abstract organizational mission"—as distinct from

8

allegations that the policy has a "direct impact on the organization's carrying out of its existing core activities." Op. 17; *see also* Op. 21-22. Any such expansion of organizational standing would impermissibly "allo[w] organizations to assert standing based on the sort of 'general legal, moral, ideological, and policy concerns' that the Supreme Court has confirmed 'do not suffice on their own to confer Article III standing.'" Op. 17-18 (quoting *Alliance for Hippocratic Med.*, 602 U.S. at 386). Second, *Alliance for Hippocratic Medicine* makes clear that this Court's cases have erred in permitting an organization to establish standing because it has diverted "resources in response to a policy"—such as by spending resources on "educational and advocacy efforts in ideological opposition to the challenged policy." Op. 18; *see also* Op. 22-23.

Therefore, the panel held, this Court's organizational standing precedents are "irreconcilable with" the Supreme Court's decision "and thus overruled." Op. 23. Then, the panel applied traditional standing principles to conclude that plaintiffs had not established standing to challenge the Cancellation Provision. First, the panel concluded that the Cancellation Provision did not directly injure plaintiffs because, with or without it, they "can still register and educate voters—in other words, continue their core activities that they have always engaged in." Op. 24. And the panel rejected plaintiffs' contention that the provision injured them by forcing them "to develop training materials or ask constituents additional questions" when engaging in those activities, explaining that this was an impermissible attempt on plaintiffs' part "to spend their way into Article III standing." *Id.*

9

Second, the panel concluded that plaintiffs' asserted harm "is too attenuated to satisfy Article III's causation requirement." Op. 24. The panel explained that plaintiffs' harm hinged on their assertion that county recorders applying the Cancellation Provision may improperly cancel a "voter's new registration instead of the old one." *Id.* But, the panel determined, the Cancellation Provision itself makes clear that the recorder confronted with multiple registrations for the same voter may only cancel any older registrations—not the newest one. Op. 25-26. And plaintiffs' speculation that recorders—"whose main job is to maintain accurate voting registration—will negligently remove the *new* voting registration and decide to keep the old one" was "simply too speculative to satisfy Article III." Op. 26 (quotation omitted).

Judge Nguyen dissented in relevant part. At the outset, she accepted as "at least arguable" plaintiffs' view that the Cancellation Provision might require county recorders to cancel a voter's new registrations if the voter has not canceled his previous registrations. Op. 52-54 (Nguyen, J., dissenting in part). And she explained that she understood "plaintiffs' core activities" to be "register[ing] and educat[ing] voters." Op. 60 (alterations in original) (quotation omitted). From there, Judge Nguyen concluded that plaintiffs had adequately alleged that the Cancellation Provision would injure plaintiffs by forcing them to "divert scarce resources" to counteract the possibility that voters who they help register will have their registrations canceled. As examples, she highlighted plaintiffs' statements that they

10

would divert resources to "ask citizens" whether "they have any previous addresses, and whether they might still be registered to vote there," and to "creat[e] a training program on how to cancel an out-of-state or out-of-county voter registration." Op. 58 (quotation omitted); *see* Op. 58-60. And she concluded that although plaintiffs "could continue to register and educate voters without changing their practices in response to the Cancellation Provision, the registrations would be inadequate, and the education incomplete." Op. 60; *see also id.* ("When legislation renders an organization's core business activities inadequate or incomplete, and the organization must expend resources modifying the activities to remedy the deficiency, then the legislation plainly affects and interferes with the activities."). According to Judge Nguyen, this Court's precedents regarding diversion of resources was unchanged by *Alliance for Hippocratic Medicine*, which in her view was "hardly a sea change in the law of organizational standing." Op. 47.

5. Plaintiffs petitioned for rehearing en banc. Their petition focused on the question whether the panel properly concluded that this Court's previous organizational standing precedents are irreconcilable with *Alliance for Hippocratic Medicine*. This Court granted that petition.

## ARGUMENT

**A.** **The Supreme Court's Decision in *Alliance for Hippocratic Medicine* Makes Clear that Plaintiffs Have Not Identified an Injury Sufficient to Confer Standing**

1. Plaintiffs advance a theory of organizational standing that was expressly rejected in the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In general, organizations may "sue on their own behalf for injuries they have sustained." *Id.* at 393 (quotation omitted). Like all litigants, however, organizations must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id.* at 393-94. Here, plaintiffs have attempted to meet these requirements by stating that they would divert "time and resources" to various voter registration and education efforts in response to the Cancellation Provision. 2-ER-250; *see also* 2-ER-259, 2-ER-266.

That diversion-of-resources theory of standing no longer has any vitality after the Supreme Court's decision in *Alliance for Hippocratic Medicine*. In that case, four associations challenged FDA's relaxation of "regulatory requirements for mifepristone, an abortion drug." *Alliance for Hippocratic Med.*, 602 U.S. at 372-73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies"

12

because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (quotation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (quotation omitted).

The Supreme Court unanimously held that the associations lacked Article III standing. The Court reasoned that organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med.*, 602 U.S. at 394. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394-95. And the Court squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "[t]hat is incorrect." *Id.* at 395. Nor did the Court consider sufficient the associations' allegation that FDA had failed to "properly collec[t] and disseminat[e] information about" mifepristone and thereby made "it more difficult" for the plaintiffs "to inform the public about safety risks" of the drug.

13

*Id.* That generic setback to the associations' missions without any actual "impediment to [their] advocacy businesses" did not support Article III standing. *Id.*

2. Plaintiffs' organizational standing theory in this case is materially indistinguishable from the one that the Supreme Court rejected in *Alliance for Hippocratic Medicine.* As there, plaintiffs here are not the object of the government action they challenge. The Cancellation Provision does not require plaintiffs to conduct—or to refrain from conducting—their advocacy, education, or registration activities in particular ways. Instead, the provision directs county recorders to cancel a voter's duplicate registration in certain circumstances, thereby regulating only government officials and registered voters. Plaintiffs are thus "unregulated parties who seek to challenge [the State's] regulation *of others.*" *Alliance for Hippocratic Med.*, 602 U.S. at 385.

Similar to the associations in *Alliance for Hippocratic Medicine*, the plaintiff organizations here declare that the Cancellation Provision will lead them to expend "additional time and resources" on various activities to accomplish their voter-education and voter-mobilization "mission[s]." 2-ER-250, 2-ER-274 (Arizona Alliance); *see also* 2-ER-259, 2-ER-276 (similar for Voto Latino); 2-ER-266, 2-ER-277 (Priorities USA). Just as the associations in *Alliance for Hippocratic Medicine* said they had to engage in "public education" because the agency was "not properly collecting and disseminating information," 602 U.S. at 394-95, plaintiffs here say they will "spend money in order to educate [their] members about the effects of" the Cancellation

Provision, 2-ER-252-53 (Arizona Alliance); *see also* 2-ER-259 (similar for Voto Latino); 2-ER-266 (Priorities USA). Likewise, plaintiffs' claim that they will "divert additional time and resources" that could be spent on other matters to engage in activities like "monitor[ing] for attempted voter purges" and "check[ing] whether" voters have "registrations in multiple states or Arizona counties" is no different from the claim made by the associations in *Alliance for Hippocratic Medicine*. 2-ER-259 (Voto Latino); *see also* 2-ER-250, 2-ER-252-53 (Arizona Alliance similarly would "use professional and volunteer time" and expend resources to engage in activities like "help[ing] answer questions from its members" and "identifying voters who have multiple registrations"); 2-ER-266 (Priorities USA would "utilize more staff time to analyze data and reports on voting activities"). All of plaintiffs' allegations related to organizational standing to challenge the Cancellation Provision rest on these same types of diversion-of-resources arguments; they offer no other theory of organizational standing. *See* Pls.' Suppl. Br. 4-8 (June 6, 2023).[1]

Although the district court did not have the benefit of the Supreme Court's decision in *Alliance for Hippocratic Medicine*, it is telling that the court's description of

---

[1] Plaintiffs have also asserted a theory of associational standing based on alleged harm from the Cancellation Provision to their members. The panel rejected this theory primarily on the ground that it rests on an "unduly speculative theory of causation—namely, that county recorders will supposedly cancel new voter registrations rather than old ones." Op. 26-27. Plaintiffs' petition for rehearing en banc did not substantially address this alternative basis for standing, and the United States takes no position on it in this brief.

plaintiffs' injuries and irreparable harm mirrors precisely what the Supreme Court deemed insufficient. The district court stated that plaintiffs had shown a "risk" that they "will need to divert resources" in response to the Cancellation Provision, 1-ER-15 n.7, and that they had established irreparable harm because they had "assert[ed] that they must divert resources to combat the negative effects of the" Cancellation Provision, 1-ER-21. And the panel dissent similarly stated that plaintiffs had adequately alleged that the Cancellation Provision would lead them to "divert scarce resources" or "expend resources modifying the[ir] activities" to counteract the statute's effects. Op. 58-60. But the Supreme Court made clear that an organization's decision to "diver[t] its resources in response to a defendant's actions" does not establish standing. *Alliance for Hippocratic Med.*, 602 U.S. at 395.

At bottom, plaintiffs have failed to show that the Cancellation Provision "directly affect[s]" or "interfere[s] with" their activities. *Alliance for Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has left no doubt that plaintiffs' expenditure of resources in response to the statute does not establish Article III standing. *See id.* at 394-95. And although the Supreme Court has recognized that an organization may—like any other litigant—have standing to sue when the defendant's conduct directly interferes with the organization's "core business activities," *see id.* at 395, plaintiffs here fail—as the panel majority correctly recognized, Op. 24—to articulate any such direct interference. And any attempt to fit plaintiffs' theory of standing in this case into that framework would allow the exception to swallow the general rule. This

16

Court thus should, like the panel majority, reject plaintiffs' invitation to endorse a

theory of organizational standing that is at odds with the Supreme Court's recent

pronouncement on this subject.

> **B.    The Supreme Court's Earlier Decision in *Havens Realty*
> Provides No Basis for Accepting Plaintiffs' Theory of Injury**

In asserting the continued vitality of their diversion-of-resources standing

theory, plaintiffs have placed considerable weight on the Supreme Court's earlier

decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See, e.g.*, Pls.' Suppl. Br.

1 (June 27, 2024). But *Havens Realty* does not provide a legitimate basis for accepting

plaintiffs' theory of injury in this case or other similar diversion-of-resources theories.

In *Alliance for Hippocratic Medicine*, the Supreme Court rejected the suggestion

that *Havens Realty* should be understood as endorsing such diversion-of-resource

theories, explaining that *Havens Realty* "does not support such an expansive theory of

standing." 602 U.S. at 395. To the contrary, as noted above, the Supreme Court

expressly stated in *Alliance for Hippocratic Medicine* that it was "incorrect" that "standing

exists when an organization diverts its resources in response to a defendant's actions."

*Id.* Whatever proposition *Havens Realty* stands for, it cannot be that the diversion of

resources is sufficient to establish standing.

In *Havens Realty*, an organization that provided "counseling and other referral

services" to "match individuals with available housing" brought a challenge under the

Fair Housing Act "to the racially discriminatory housing practices of an apartment

complex owner." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1099-1100 (D.C. Cir. 2015) (Millett, J., dubitante) (quotation omitted). The Fair Housing Act "conferred on all persons"—defined to include "associations" like the organizational plaintiff—a "legal right to truthful information about housing." *Id.* at 1100 (quotation omitted). And the apartment complex owner allegedly violated the statute, including by providing "discriminatory misinformation" about "housing opportunities" that "directly frustrated and unraveled" the organization's "efforts to match individuals with available housing." *Id.*

In that context, it is "unsurprising" that the Supreme Court recognized the organization's standing. *People for the Ethical Treatment of Animals*, 797 F.3d at 1100 (Millett, J., dubitante). As the Supreme Court explained in *Alliance for Hippocratic Medicine*, in *Havens Realty* the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." 602 U.S. at 395. In particular, as Judge Millett explained even before *Alliance for Hippocratic Medicine*, the organization was provided by federal law "with a specific legal right to truthful, non-discriminatory housing information." *People for the Ethical Treatment of Animals*, 797 F.3d at 1100 (Millett, J., dubitante). That sort of interference with a specific legal right was crucial to the Supreme Court's holding and necessarily limits the precedential effect of *Havens Realty* in other circumstances, particularly now that the Supreme Court has expressly

18

recognized that *Havens Realty* was "an unusual case" whose holding should not be extended "beyond its context." *Alliance for Hippocratic Med.*, 602 U.S. at 396.

In contrast to the organization in *Havens Realty*, the associations in *Alliance for Hippocratic Medicine* asserted only that "FDA is not properly collecting and disseminating information about" a drug, which "in turn makes it more difficult for [the associations] to inform the public about safety risks." 602 U.S. at 395. As the Supreme Court recognized, that generic setback to the associations' missions without any actual "impediment to [their] advocacy businesses" was a different "kind of injury" than what was at issue in *Havens Realty*. *Id.*

Plaintiffs' theory of injury here suffers from the same flaws. At its core, plaintiffs' assertion is that the Cancellation Provision may lead county officials to cancel voters' registrations in violation of federal law. And plaintiffs have avowed that they would expend resources trying to ameliorate this injury to third parties. But the Cancellation Provision does not directly regulate, or impose any actual impediments on, plaintiffs' own voter-related activities. And plaintiffs do not assert that federal law provides them—rather than voters—with any underlying legal right that the statute allegedly violates. In this context, *Havens Realty* provides no support for plaintiffs' theory.

19

**C.  The Diversion-of-Resources Theory of Standing Advanced by Plaintiffs Is Incompatible with Ordinary Standing Principles**

When an organization seeks to "sue on [its] own behalf," it must be held to the "usual standards" that a litigant is required to meet to establish Article III standing. *Alliance for Hippocratic Med.*, 602 U.S. at 393-94 (quotation omitted). As *Alliance for Hippocratic Medicine* recognized, however, a conception of organizational standing that allows organizations to challenge policies that do not regulate them so long as they divert resources in response to those policies is incompatible with ordinary standing principles. For that reason, the Supreme Court rejected such diversion-of-resources theories of standing.

In nevertheless arguing that they have standing in this case, plaintiffs advance a theory that is incompatible with the Supreme Court's decision in *Alliance for Hippocratic Medicine*, as explained. *See supra* pp. 14-17. More fundamentally, however, plaintiffs' theory—like the similar theories in other cases on which plaintiffs rely—distorts normal Article III principles in a variety of ways. Any decision accepting that theory would thus reintroduce the incongruities that the Supreme Court identified in *Alliance for Hippocratic Medicine*. In that case, the Supreme Court ensured that standing doctrine for organizations would be aligned with ordinary standing doctrine, as Judge Millett had called for in her opinion in *People for the Ethical Treatment of Animals*. Those ordinary standing principles reinforce that plaintiffs lack standing in this case.

*First*, it is a "fundamental restriction" on courts' "authority that in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (alteration and quotation omitted). By contrast, plaintiffs may assert the rights of third parties only in "certain, limited" circumstances, *id.* (quotation omitted)—and only where the plaintiffs themselves have also "suffered an injury in fact" that "give[s] them a sufficiently concrete interest in the outcome of the issue in dispute," *Alliance for Hippocratic Med.*, 602 U.S. at 393 n.5 (quotation omitted). But diversion-of-resources standing may allow an organization to effectively evade these requirements, injuring itself in an attempt to protect the interests of third parties and then bootstrapping that injury into a suit asserting the third parties' rights.

This case illustrates the point. As explained, the Cancellation Provision does not directly regulate plaintiffs; instead, it is directed at the circumstances in which county recorders may cancel a voter's duplicate registration. And plaintiffs—who are organizations, not registered voters—cannot register to vote, cannot have a voter registration canceled, and have no cognizable interest in whether county recorders cancel voters' registrations. Thus, in this litigation, plaintiffs do not assert their own legal rights regarding federal law's restrictions on the process by which voter registrations may be canceled but instead effectively assert the legal rights of others. But plaintiffs have not demonstrated that they satisfy the strict limits that the Supreme Court has placed on the ability of litigants to assert others' rights.

21

Nor is the problem limited to this suit. For example, the Supreme Court has made clear that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004). But this Court has held that a diversion-of-resources theory of standing permits an organization of attorneys who represent "immigrants seeking asylum" to challenge an asylum regulation that "frustrate[s] their mission of providing legal aid to affirmative asylum applicants" by rendering some potential applicants ineligible. *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766, 768 (9th Cir. 2018) (quotation omitted). That same logic would, for example, allow an organization of "medical malpractice attorney[s]" to claim cognizable injury from "tort reform statutes," *Kowalski*, 543 U.S. at 134 n.5, on the ground that the statutes require the organization to expend resources educating attorneys on the statute's changes. Or it would allow an organization of "attorney[s] specializing in Social Security cases [to] challenge implementation of a new regulation," *id.*, on the ground that they will respond to the regulation by expending resources developing new arguments. But those outcomes would be improper.

*Second*, diversion-of-resources theories of standing are inconsistent with the general rule that harm to a litigant's abstract interests does not reflect a cognizable Article III injury. As the Supreme Court has made clear, "a desire to vindicate value interests" does not give rise to the direct, concrete stake in government action necessary to support Article III standing. *Diamond v. Charles*, 476 U.S. 54, 66 (1986).

22

Thus, for example, a physician with "an interest" in protecting unborn children does not have standing to defend, as an intervenor, a state law prohibiting abortions in certain circumstances. *See id.* at 66-67; *cf. Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988) ("A mere interest in a problem, no matter how longstanding the interest and how qualified the plaintiff is in evaluating the problem, is not sufficient by itself to confer standing." (alterations and quotation omitted)). But a plaintiff organization's desire to challenge government actions that impinge its "mission" reflects nothing more than the organizational equivalent of an individual's attempt to vindicate his value interests.

For example, this Court has held that "an organization dedicated to 'eliminating discrimination against individuals with disabilities by ensuring compliance with accessibility laws' had standing to sue a real estate developer who constructed properties with alleged design and construction defects that violated those laws." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring and dissenting) (alterations omitted) (quoting *Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)). Because "the organization's ultimate goal was to eliminate discrimination against individuals with disabilities" and because the money that the organization spent to monitor the asserted violations "diverted resources from other efforts," this Court held that it had established organizational standing. *Id.* (quotation omitted). But that theory of injury "looks suspiciously like a harm that is simply a setback to the organization's abstract"

23

interests—the sort of harm that is "not a concrete and demonstrable injury." *Id.* at 1226 (quotation omitted). Nor would it be plausible to think that any individual with a general interest in eliminating housing discrimination could similarly claim Article III standing to sue any real estate developer who allegedly engaged in such practices; such a result would eviscerate Article III's limitations.

This case also illustrates the principle. Of course, many individuals may believe fervently in the importance of safeguarding the right to vote and may object on moral or policy grounds to statutes that they think impede registered voters' ability to vote. But just as the physician in *Diamond* could not rely on his interest in protecting unborn children to establish standing to defend an abortion regulation, an individual with an interest in the right to vote cannot rely on that interest to establish standing to challenge a voting regulation. The failure to demonstrate standing in those circumstances would remain even if the individual acted on his abstract interest by, for example, advocating against the regulation or educating members of the public about it. *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982) ("It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."). But that theory of standing is, in all relevant respects, the individual equivalent of the theory advanced by plaintiffs here.

*Third*, and relatedly, ordinary standing principles generally do not permit litigants to spend their way to standing. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"—such as by spending funds—"based on their fears of hypothetical future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Thus, "a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing." *People for the Ethical Treatment of Animals*, 797 F.3d at 1099 (Millett, J., dubitante).

But this general rule is "hard to reconcile" with diversion-of-resource theories of standing like the one advanced by plaintiffs. *People for the Ethical Treatment of Animals*, 797 F.3d at 1099 (Millett, J., dubitante). As *Clapper* makes clear, "where concerns about governmental action that was not targeted at the plaintiffs did not constitute an Article III injury, the costs voluntarily incurred in response to those concerns could not fill in the gap either." *Id.* at 1103 (citing *Clapper*, 568 U.S. at 417-18). But diversion-of-resources theories often rely on precisely that impermissible gap-filling. Take this case as an example. Plaintiffs have not contended—and could not properly contend—that they would be directly injured if a county recorder were to cancel a voter's registration. But plaintiffs' entire theory of standing rests on the premise that they can generate injury by voluntarily incurring costs in response to the possibility that county recorders may cancel voters' registrations. As *Clapper* makes clear, that

theory would be inadequate for an individual, and it should not work for an organization either.

*Fourth*, plaintiffs' theory of standing also causes considerable tension with ordinary remedial principles, which are themselves founded on Article III concepts. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration and quotation omitted). And ordinary equitable principles reinforce that limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

In general, those principles mean that injunctive relief must be party-limited. Thus, a voter who could demonstrate standing to challenge the Cancellation Provision would properly receive (if he prevailed on the merits) relief limited to his own voter registration. Here, however, plaintiffs sought—and received—universal injunctive relief from the district court, seemingly preventing defendants from enforcing the Cancellation Provision as applied to any voter's duplicate registrations. *See* 1-ER-23. That relief may have been necessary to redress plaintiffs' asserted injuries in this case,

26

which involve costs that they assert they will incur to educate and advocate across all voters. But the inability for courts to fashion more targeted, plaintiff-specific relief to redress those injuries only highlights the ways in which those asserted injuries themselves depart from ordinary principles.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated in relevant part.

Respectfully submitted,

YAAKOV M. ROTH
    *Acting Assistant Attorney General*

TIMOTHY COURCHAINE
    *United States Attorney*

DANIEL TENNY

   *s/ Sean R. Janda*
SEAN R. JANDA
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7260*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-3388*
    *sean.r.janda@usdoj.gov*

April 2025

27

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Ninth Circuit Rule 29-2(c)(3) because it contains 6326 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda